IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ANDRIA M. LAUGHLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 06-1010-MO |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | OPINION AND ORDER |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

MOSMAN, District Judge:

Plaintiff Andria Laughlin challenges the Commissioner's decision denying her applications

for disability insurance benefits and supplemental security income payments under Titles II and XVI

of the Social Security Act. I have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). I affirm the

Commissioner's decision.

The court reviews the Commissioner's decision to ensure that proper legal standards were

applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g);

*Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Ms. Laughlin argues the ALJ improperly assessed her residual functional capacity ("RFC"), thereby undermining the conclusion at step five of the decision-making process.

The RFC is an assessment of the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5.

Ms. Laughlin asserts the ALJ erred by failing to properly consider the functional limitations identified in her testimony, in certain medical source statements and in the testimony of a lay witness. Ms. Laughlin contends these errors produced an RFC assessment which did not accurately reflect her actual functional limitations and undermined the ALJ's conclusion that she is able to perform work in the national economy.

## I.    **Ms. Laughlin's Testimony**

Ms. Laughlin testified that she has pain in the low back, left leg, upper back, and left shoulder. The left shoulder pain radiates down her left arm resulting in cramps and numbness in her left hand. Rotating her head causes pain in the neck and looking down continuously for several minutes causes stiffness in the neck. Ms. Laughlin has difficulty reaching with the left hand above her head and pushing, pulling or lifting more than 20 pounds.

Ms. Laughlin estimated she can sit for 30 minutes at a time, stand for 20 to 30 minutes at a time and walk 3 or 4 blocks before stopping to rest.  She has difficulty stooping, bending at the waist, crouching and kneeling.   Her pace in activities is about 50% slower than it used to be.

Ms. Laughlin said she has daily panic attacks and crying spells which last up to 90 minutes during which she cannot function at all.  She alleged lifelong problems with short term memory, attention and concentration.  She experiences mood swings.  Ms. Laughlin testified she has frequent severe headaches, relieved by resting in a dark room or taking medication.  Ms. Laughlin has dizziness a couple of times a week lasting  about 30 minutes each time.  She has dyslexia, causing her to be slow in reading and arithmetic.

The ALJ accepted much of Ms. Laughlin's testimony, as shown by his RFC assessment:

> [Ms. Laughlin has the RFC to perform work which] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . She is able to sit, stand and walk 30 minutes at a time with no overall limitations.  She is restricted to work not requiring constant head rotation.  She is unable to reach above shoulder level with the left upper extremities.  She is limited to occasionally climb, balance, stoop, kneel, crawl, and crouch.  She is limited to simple, routine, repetitive work.  She is restricted to occasional public and co-worker interaction.  She is limited to work not involving detailed reading or numbers because of dyslexia.  She needs to have a supervisor who understands these limitations.  She should avoid hazards.

Tr. 387-88.[1]

The RFC assessment reasonably reflected Ms. Laughlin's testimony about her limitations in lifting, sitting, standing, walking, climbing stairs and reaching above shoulder level on the left.  The

---

[1] "Tr." refers to the official transcript of the Administrative Record (docket # 16).

ALJ reasonably accommodated Ms. Laughlin's assertions of neck pain with head rotation, postural limitations, anxiety in certain social interactions, dyslexia, cognitive limitations and dizziness.

The ALJ found Ms. Laughlin's statements about the intensity, duration and limiting effects of her symptoms not entirely credible, however. Thus, he did not believe her symptoms imposed functional limitations in excess of those described in his RFC assessment or precluded all work.

Ms. Laughlin contends the ALJ failed to articulate legally sufficient reasons for discounting her testimony. In deciding whether to accept subjective symptom testimony, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986).

Here the ALJ found that Ms. Laughlin failed to produce objective medical evidence of a physical impairment that could reasonably be expected to significantly limit her ability to work. Ms. Laughlin contends treatment records from Kar-yee Wu, M.D., showed lumbar and cervical sprains, a left shoulder strain and muscle spasms. Tr. 289, 291-93, 302, 318. She cited a nurse practitioner's treatment note indicating she was offered Imitrex for "migraine headaches" on one occasion. Tr. 305.

These medical records reflect Ms. Laughlin's subjective claims of acute injury or illness in discrete parts of her body, but do not support the presence of any chronic condition that could account for her ongoing physical symptoms. An MRI showed her cervical spine in correct anatomical alignment with vertebral bodies of normal height and signal. There was no evidence of spinal canal stenosis, disc protrusion or neuroforaminal narrowing at any level. Tr. 781. At most,

Ms. Laughlin had minimal posterior narrowing at one disc space.  Images of the lumbosacral spine, thoracic spine, pelvis and hips were completely normal.  Tr. 787, 842, 843.  An MRI of the left shoulder revealed slightly increased signal intensity supporting only mild tendinitis.  Tr. 782.  The record does not include a diagnosis of migraines or regular complaints of severe headaches.

Although he was doubtful Ms. Laughlin had met the threshold requirement for a credibility determination, the ALJ proceeded to the second stage of the credibility analysis.  An ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d at 1283.  He may consider objective medical evidence and the claimant's treatment history.  *Smolen*, 80 F.3d at 1284.  The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations.  *Id.*  In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid.  *Id.;*SSR 96-7p, 1996 WL 374186.

Here the ALJ considered proper factors and made specific findings to support his credibility determination.  The ALJ reviewed all the objective medical evidence and concluded it did not support any impairment that could reasonably be expected to produce the debilitating physical symptoms Ms. Laughlin claimed in her testimony.  Tr. 386, 388.

The ALJ reviewed Ms. Laughlin's treatment history which showed frequent conservative treatment for minor injuries and illnesses which did not produce significant clinical or objective findings.  After reviewing all of Ms. Laughlin's medical records, David Gostnell, Ph.D., remarked

that they reflected "heavy utilization of Emergency Department services, with a variety of physical complaints, many of which have been of a mild nature or disproportionate to physical findings." Tr. 386, 1016.

In 2000, Ms. Laughlin was treated for a twisted knee, pain in the hips from a minor motor vehicle collision, a sprained ankle, a sore left wrist and abdominal pain of unknown origin. In each case, diagnostic images were negative or considered unnecessary and there were no other significant findings. Tr. 204, 212, 223-24, 228, 316. These records do not support Ms. Laughlin's assertion of ongoing physical symptoms beginning in 2000.

In 2001, Ms. Laughlin had a muscle strain on the right side of her back without significant findings or ongoing symptoms. Tr. 301-02. On April 9, 2001, Ms. Laughlin reported a sudden onset of neck and shoulder pain with radiation to the left hand. Cervical images showed no subluxation or fracture and only minimal posterior narrowing at the C7-T1 disc space. Clinical findings included cervical muscle spasm and subjective radiculopathy involving the left hand. Tr. 295-96, 298-99. On April 26, 2001, Ms. Laughlin reported her neck pain had improved and her radicular symptoms resolved. She had full range of motion in the neck and her physical examination was within normal limits. Tr. 292-93. In June 2001, Ms. Laughlin threw her back out lifting a heavy garbage bag, but did not have range of motion limitations or require follow up care. Tr. 186, 289. These records do not support Ms. Laughlin's claim of ongoing physical impairments during 2001.

In August 2002, Ms. Laughlin received conservative treatment for a spontaneous onset of neck pain and sciatica. Tr. 892. In October 2002, she reported pain in her left shoulder after carrying a heavy roll of carpet. X-rays of the shoulder were normal. Ms. Laughlin began what became chronic use of Oxycodone. Tr. 884-85. On December 4, 2002, Ms. Laughlin had full range of

motion in the shoulder, but was unable to reduce her pain medication.  Heather Paladine, M.D.,

noted "I think she is improving well.  I am concerned, however, about her continued pain medication

use and feel that some of this is due more to her stressful life circumstances rather than her shoulder

problem."  Tr. 868, 883.  On December 27, 2002, an MRI of the cervical spine was completely

normal.  These records do not support Ms. Laughlin's claim of ongoing symptoms throughout 2002.

In May 2003, an MRI of the shoulder confirmed the absence of a rotator cuff tear.  It showed

a slightly increased signal intensity supporting mild tendinitis in the shoulder.  Tr. 781-82.  Ms.

Laughlin thereafter reported a series of exacerbations of her shoulder pain from lifting her child,

work activities and other minor incidents.  Tr. 867, 880, 883, 953-54.  She continued to use

Oxycodone until she was "detoxed off" following a methamphetamine relapse in April 2004.  Tr.

948.  There is no indication that terminating her narcotic pain medication made her shoulder

condition less bearable.

The treatment history shows that Ms. Laughlin went long periods without requiring care. For

example, between April 2001 and October 2002, she had no significant physical complaints.  In

addition, she sought treatment for a variety of discrete physical problems until she developed mild

tendinitis in October 2002.  This is the only physical impairment supported by the record, and the

ALJ's RFC assessment fully accommodates the limitations it imposes.

The ALJ believed the treatment history for Ms. Laughlin's tendinitis suggests drug seeking

behavior and reflects adversely on her credibility.  He based this conclusion on the frequency of Ms.

Laughlin's requests for narcotic pain medication predicated on complaints disproportionate to the

physical findings.  Tr. 386, 388.  Although the objective findings suggested only mild tendinitis, Ms.

Laughlin reported severe pain.  She sought early refills for Oxycodone and her use increased despite

indications of improvement in her condition.  Tr. 322, 866, 883.  For example, on July 10, 2003, Dr. Paladine intended to wean Ms. Laughlin from Oxycodone, but gave her a prescription for 120 to last one month.  Tr. 868.  One week later, Ms. Laughlin requested a refill.  Tr. 866.

Ms. Laughlin has a very significant history of substance abuse with dependence on alcohol, methamphetamine and tobacco. Tr. 249-50.  She admitted relapses during the relevant period and the medical expert testified that it was difficult to determine whether there had been any periods of sobriety.  Tr. 196, 850, 948, 1010, 1095. In the context of Ms. Laughlin's addiction problems with other substances, the ALJ's conclusion that her medical records suggest she exaggerated her pain complaints to obtain narcotic medications is rational.  It will not be disturbed.  *Batson*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

Similarly, the ALJ found Ms. Laughlin's alleged psychiatric limitations largely unsupported by objective or clinical findings.  For example, Ms. Laughlin reported a prior diagnosis of bipolar disorder, with a recent increase of depressive symptoms to Andrew Ellis, Ph.D., and Arthur Wiens, Ph.D.  She believed she had impaired memory and motor function on the left.  Drs. Ellis and Wiens found no abnormality of mood on their mental status examination.  On formal testing, Ms. Laughlin demonstrated average IQ, and average to low average cognitive abilities.  Contrary to her subjective complaints, her memory was intact and Drs. Ellis and Wiens found no perceptible difference in motor function between left and right.  Tr. 256-63.

Ann Anthony, M.D., evaluated Ms. Laughlin in February 2000. She believed the formal testing by Drs. Ellis and Wiens demonstrated  "abilities to perform adequately in a wide range of jobs."  Tr. 251.  Dr. Anthony's mental status examination did not yield abnormal findings.  She diagnosed bipolar disorder and personality disorder based on Ms. Laughlin's subjective report of

mood swings three or four times a year and conflicts with authority leading to employment problems. Dr. Anthony assigned a global assessment of functioning ("GAF") of 55 to 60, indicating moderate symptoms or moderate difficulty in social or occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994)("DSM-IV") 30-32. Tr. 253.

David Jeffrey, M.D., took over Ms. Laughlin's psychiatric care in August 2000. Tr. 225. Based on Ms. Laughlin's subjective history, Dr. Jeffrey believed she suffered from symptoms of posttraumatic stress disorder ("PTSD"), panic disorder and adult attention deficit disorder. Dr. Jeffrey reported these symptoms to be well controlled by medications. Tr. 184, 187, 190-92.

On March 27, 2001, Jane Starbird, Ph.D. evaluated Ms. Laughlin with a clinical interview, mental status examination and review of the records from Drs. Ellis and Wiens, Anthony and Jeffrey. Ms. Laughlin showed no signs of physical limitation or discomfort, extreme mood swings or thought disorder. Despite the diagnoses she carried, Ms. Laughlin was unable to spontaneously describe her mood, the frequency of her panic attacks or any symptoms consistent with PTSD, endorsing such symptoms "only when prompted by the examiner." Tr. 162.

On March 7, 2002, a mental health assessment at Columbia County Mental Health clinic produced a mental status examination with no abnormal findings. The evaluator felt Ms. Laughlin's subjective symptoms supported a diagnosis of adjustment disorder with anxiety and depression and borderline personality features. He assigned a GAF of 62, which is used to indicate mild symptoms or mild difficulties in function, "but generally functioning pretty well." DSM-IV 30-32. Tr. 371-72.

On June 27, 2002, Ms. Laughlin's primary care physician reported she was doing well with her anxiety and depression on her medications, Seroquel, Trazadone and occasionally, Valium.  Tr. 894.

On September 17, 2003, Gary Sacks, Ph.D, evaluated Ms. Laughlin.  Her mood appeared to be dysthymic.  Dr. Sacks made no other abnormal findings in his mental status examination.  Ms. Laughlin was "quick to endorse all symptoms posed to her" but "when asked to spontaneously describe symptoms of the various mental health conditions she believes she suffers, she provided vague and limited information."  Tr. 847.

In September 2005, Dr. Gostnell administered a clinical interview, mental status examination, formal testing and a review of Ms. Laughlin's medical records.  In her mental status examination, Ms. Laughlin exhibited no signs of restlessness, hyperarousal or accelerated psychomotor activity, although she suggested she was beginning a manic phase of bipolar disorder.  Her affect was mildly restricted but stable, with marginal signs of depression and anxiety, but no indication of emotional extremes.  She had no difficulty understanding and responding appropriately to questions and task instructions.  She was an inconsistent historian, offering contradictory statements.  Tr. 1012.

On formal testing, Ms. Laughlin scored in the average range for general intellectual functioning and the low average range for working memory.  Her scores demonstrated a normal capacity for new learning and recall, verbal reasoning and language skills.  Ms. Laughlin showed superior abilities in perceptual organization and nonverbal reasoning.  On the MMPI-2 personality measure, Ms. Laughlin demonstrated an exaggerated test-taking attitude.  Tr. 1012-14.

Dr. Gostnell remarked that Ms. Laughlin's multiple mental health examinations had produced an array of inconsistent diagnoses, with personality disorder and substance abuse the common thread. He opined that Ms. Laughlin demonstrated "a strong tendency toward embellishment of both psychiatric and medical symptoms," but had "no substantial impairments involving her communication skills or language functions, her capacity for interpersonal functioning or social interactions, or her ability to retain and implement verbal instructions."  Tr. 1016.

The ALJ could reasonably conclude from the absence of objective and clinical findings supporting Ms. Laughlin's description of her symptoms, the inconsistent array of diagnoses based on her various subjective reports, the relatively benign GAF scores, the opinion of Dr. Gostnell that she has a strong tendency to embellish her symptoms and the reports from treating sources that her symptoms were controlled by medications, that Ms. Laughlin's statements about the intensity, duration and limiting effects of her mental impairments were not entirely credible.

The ALJ also believed Ms. Laughlin had not been candid in describing her drug use to Dr. Wu.  On April 14, 2004, Ms. Laughlin told Dr. Wu she had lost custody of her child due to relapsing into methamphetamine use.  She reported she had stop using and was clean and sober.  Random drug screens by a state child services agency were positive, however.  Ms. Laughlin explained that methamphetamine cleared out of her system slowly.  Tr. 948.

Later, Ms. Laughlin admitted to Dr. Gostnell that she had continued IV methamphetamine use in 2004 and was arrested that November, for possession of a controlled substance and hindering prosecution.  She stopped using methamphetamine when she was required to enter inpatient treatment on December 29, 2004.  Tr. 1010.  The ALJ was entitled to conclude that her untruthful statements adversely affected her credibility.

The ALJ's reasons for discrediting parts of Ms. Laughlin's testimony are clear and convincing and rest on a reasonable interpretation of the evidence in the record as a whole. His findings are sufficiently specific to permit this court to conclude he did not discredit her testimony arbitrarily. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). Accordingly, the ALJ's credibility determination is sustained.

## II.    Medical Source Statements

Ms. Laughlin contends the ALJ failed to properly evaluate limitations identified in the reports of the agency reviewing psychologists, in a letter Dr. Jeffrey wrote on Ms. Laughlin's behalf and in a medical source questionnaire completed by Dr. Wu.

### A.    Reviewing Consultants

The Commissioner relies on medical and psychological consultants to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they impose. 20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p, 1996 WL 374.180. Findings of fact by such sources must be treated as the expert opinions of nonexamining sources. SSR 96-6p, 1996 WL 374.180 *2. The ALJ is not bound by such findings, but may not ignore them and must explain the weight given to the opinions in the decision. *Id.*

The Commissioner obtained three sets of reports from such consulting psychologists in the development of the present case. In April 2001, Dick Wimmers, Ph.D., prepared a Mental Residual Functional Capacity assessment ("MRFC") indicating Ms. Laughlin was capable of simple routine tasks and routine interactions with co-workers. He opined "she should not work with the general public due to depression and personality features." Tr. 180-82.

In July 2001, Robert Henry, Ph.D., prepared a similar MRFC indicating Ms. Laughlin was capable of simple routine tasks, keeping a normal work schedule and routine contacts with co-workers. He did not think Ms. Laughlin should work directly with the public. He opined "In a slow paced setting, she would be capable of sustaining adequate [attention, concentration and persistence]." Tr. 270.

In October 2003, Karen Bates-Smith, Ph.D., reviewed Ms. Laughlin's updated records. Dr. Bates-Smith opined:

> [Ms. Laughlin] is able to carry out short and simple instructions . . . Some concentration difficulties but clearly able to concentrate sufficiently to perform simple tasks. Is able to maintain a schedule. Can make simple decisions. Should not be required to have direct public contact but can have occasional incidental contact.

Tr. 927. Dr. Henry affirmed Dr. Bates-Smith's findings in December 2003. Tr. 928.

Ms. Laughlin contends the ALJ failed to properly evaluate Dr. Wimmers's opinion that she should not work with the general public and Dr. Henry's opinion that she required a slow-paced setting to sustain adequate attention, concentration and persistence.

The ALJ considered all three reports. He agreed generally with Dr. Wimmers's findings, but found the evidence had not established that Ms. Laughlin should have no contact with the public. Tr. 390. Substantial evidence supports this finding. Dr. Bates-Smith reviewed a more developed record than Dr. Wimmers and concluded Ms. Laughlin could have occasional public contact. Tr. 927. Dr. Henry agreed with this conclusion. Tr. 928.

Dr. Gostnell administered a comprehensive examination and reviewed a complete record including over 4-years of additional development after Dr. Wimmers issued his MRFC. Dr. Gostnell concluded Ms. Laughlin had only slight impairment of the ability to interact appropriately with the

public.  Tr. 392, 1026.  She had some mild limitations in such interactions, but could generally function well.  Tr. 1025.  No treating or examining mental health provider contradicted this conclusion.

In Ms. Laughlin's brief, her attorney asserts that the ALJ failed to explain why he rejected "plaintiff's need to work at a reduced pace."  Plaintiff's Brief 29.  Dr. Henry indicated that Ms. Laughlin would be able to maintain concentration and attention in a slow-paced setting, which appears to address the appropriate work environment, not the pace at which Ms. Laughlin can work. Dr. Henry's statement appears to reflect Ms. Laughlin's statement describing anxiety symptoms which arose in situations with "lots of chaos/cacophony around her."  Tr. 211.  Dr. Jeffrey described this symptom as chronically poor concentration with multiple simultaneous stimuli.  Tr. 194.

Nevertheless, the remand order from this court required the ALJ to explain why he rejected the opinion that Ms. Laughlin had to work at a slow pace.  Tr. 398.  The ALJ explained that the evidence does not support the need for a slow pace.  Two years after Dr. Henry's MRFC, Dr. Bates-Smith reviewed a more developed record and concluded that Ms. Laughlin had some concentration difficulties but was clearly able to concentrate sufficiently to perform simple tasks.  Tr. 927.  Dr. Bates-Smith did not indicate a need for reduced pace or a slow-paced setting.  Dr. Henry affirmed and adopted this finding himself, apparently abandoning his earlier opinion.  Tr. 928.

Dr. Gostnell's post-hearing evaluation indicated that Ms. Laughlin had only slight difficulty with concentration, except in mental calculations and arithmetic problem-solving, which were moderately impaired.  Tr. 1013.  He did not suggest that Ms. Laughlin required a slow pace to maintain attention or concentration.  The ALJ also relied on reports from mental health and primary

care providers indicating Ms. Laughlin's anxiety and depression appeared to be controlled by medications. Tr. 184, 187, 198, 200, 209, 217, 390.

Dr. Henry's opinion appeared to be based on Ms. Laughlin's mental impairments. This is consistent with Dr. Jeffrey's observation that Ms. Laughlin's subjective decrease in attention seemed to be involved with her anxiety disorder and panicky feelings. Tr. 196.

Nonetheless, the ALJ also concluded Ms. Laughlin's physical impairments did not support the need for a reduced pace. As described previously, Ms. Laughlin's physical impairments remain undiagnosed and unsupported by objective findings except mild tendinitis in the left shoulder.

Ms. Laughlin cites treatment records from Dr. Wu to support physical impairments requiring a slow pace. This argument is unpersuasive. First, Dr. Wu began treating Ms. Laughlin two years after Dr. Henry prepared his MRFC. Dr. Henry could not have relied on Dr. Wu's findings in forming his opinion. Second, Ms. Laughlin cites observations about her left shoulder, which support the ALJ's finding that she is unable to use the shoulder to reach above shoulder level, but do not say anything about the pace at which she can work.

Ms. Laughlin argues that medication side effects and obesity may contribute to her need for a slow pace. She fails to cite medical records in which medication side effects or obesity were found to have any bearing on her residual functional capacity. Dr. Wu indicated side effects were unlikely in Ms. Laughlin's case because she had been on her medications for an extended period of time and had not complained of typical side effects. Tr. 931. Accordingly, Ms. Laughlin's speculative argument cannot be sustained.

Ms. Laughlin objects to the ALJ's statement that no treating physician assessed a need to work at a slow pace. Tr. 390. In fact, Dr. Wu completed a worksheet prepared by Ms. Laughlin's

attorney suggesting that it would be reasonable to expect Ms. Laughlin to require a reduced work

pace if her shoulder pain did not improve and her mental impairments were not controlled.  Tr. 932.

Dr. Wu also suggested the prognosis for resolving these conditions would be good if Ms. Laughlin

were compliant with treatment recommendations she had not followed.  Tr. 931. The record shows

Ms. Laughlin's mental impairments reasonably controlled when she is compliant with medication

and therapy.  The ALJ's RFC assessment precluded work requiring use of the shoulder.  Under these

circumstances, Dr. Wu's statement does not support the need for a slow pace.

     In summary, the ALJ did not ignore the consulting experts' opinions regarding Ms.

Laughlin's ability to work with the public and maintain attention and concentration.  He explained

why he gave no weight to the two statements and articulated reasons that are supported by substantial

evidence in the record as a whole.

### B.    Treating Physicians

     Ms. Laughlin contends the ALJ erroneously rejected a letter Dr. Jeffrey wrote on her behalf

and portions of a questionnaire prepared by her attorney and completed by Dr. Wu.

     An ALJ can reject a treating physician's opinion in favor of the conflicting opinion of another

physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are

based on substantial evidence in the record."  *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir.

2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  If the treating physician's

opinion is not contradicted by another physician, then the ALJ may reject it for clear and convincing

reasons. *Id.*

     On August 29, 2001, Dr. Jeffrey wrote to the state Adult and Family Services agency

indicating that Ms. Laughlin was functionally impaired because her panic disorder and attention

deficit disorder were not in good control.  He opined that her condition "may preclude her from being [able] to complete retraining/vocational rehabilitation at this time and likely for at least 2 months." Tr. 625. The letter was jointly signed by Dr. Jeffrey and Pamela Edwards, M.D.

The ALJ gave no weight to the letter.  Tr. 390.  He found that Drs. Jeffrey and Edwards did not refer to any objective or clinical findings to support their opinion that Ms. Laughlin was functionally impaired.  They did not identify specific work-related activities she could not perform. An ALJ can properly reject a physician's opinion that is conclusory and unsupported by clinical findings. *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999).

The ALJ reviewed Dr. Jeffrey's progress notes and found them inconsistent with the opinion that Ms. Laughlin was unable to participate in retraining.  On May 19, 2001, Ms. Laughlin's panic disorder and associated mood reactivity were stabilizing on medications. Tr. 190.  On June 14, 2001, Dr. Jeffrey found she was experiencing "good symptomatic control" with her medications. Tr. 187. On July 12, 2001, she continued to be stable and was having "good effect" from her medications. She self-discontinued one medication because she did not like how it made her feel, although it was helpful in keeping her focused and task-oriented.  Dr. Edwards was prepared to replace it with a different medication, but Ms. Laughlin terminated treatment before she could do so.  Tr. 184.

Drs. Jeffrey and Edwards did not see Ms. Laughlin again, or record any additional findings before writing the letter in controversy. Ms. Laughlin restarted her medications through Dr. Paladine in April 2002 and by June 27, 2002, Dr. Paladine observed that she was doing well with anxiety and depression on her medications.  Tr. 894, 900.

From these records the ALJ could rationally conclude that Ms. Laughlin was stable with good symptomatic control when she remained compliant with her medication therapy.  It was rational to

conclude that Dr. Jeffrey's progress notes gave no indication Ms. Laughlin had impairments that would prevent her from attempting vocational retraining. These are legally sufficient reasons for rejecting Dr. Jeffrey's letter under either the specific and legitimate or the clear and convincing standard.

The ALJ also pointed out that the letter purported to establish a 2-month period of functional impairment. Even if credited fully, the letter would not establish a limitation of sufficient duration to support a disability finding. At most, it would establish that participation in vocational rehabilitation would be difficult until Ms. Laughlin stabilized on her medications. Any enlargement of that period was attributable to Ms. Laughlin's noncompliance with prescribed therapy.

On April 9, 2004, Dr. Wu completed a questionnaire prepared by Ms. Laughlin's attorney regarding limitations in work-related activities. Tr. 930-37. He indicated Ms. Laughlin had tendinitis in the left shoulder causing pain and limited range of motion. She had muscle tension in the shoulder, an equivocal impingement sign and "variably reproducible" diffuse tenderness. Tr. 931.

Dr. Wu assessed work restrictions generally consistent with those in the ALJ's RFC assessment. Indeed, the ALJ's RFC assessment included greater restrictions on sitting, standing, walking and postural functions. Tr. 387-88, 934-35. Dr. Wu opined Ms. Laughlin could lift 20 pounds frequently and 50 pounds occasionally on the right, but could not lift 10 pounds occasionally with the left arm. Tr. 935.

The ALJ did not give full weight to Dr. Wu's assessment and specifically rejected the lifting limitation of less than 10 pounds. Tr. 391. The ALJ noted no objective medical evidence supported

such a severe lifting limitation.  As described previously, the diagnostic images showed very little except a slight increase in signal intensity consistent with mild tendinitis.  Tr. 781-82.

Dr. Wu's progress notes did not include clinical findings to support a lifting limitation of less than 10 pounds.  Dr. Wu first saw Ms. Laughlin on July 24, 2003.  He did not conduct a physical examination or make clinical findings, but simply recorded her subjective history.  Tr. 864.  Ms. Laughlin did not complain of shoulder pain and Dr. Wu did not examine her shoulder during her next 6 office visits.   Tr. 853-54, 857, 861-63.

Dr. Wu first examined Ms. Laughlin's shoulder on October 17, 2003, when Ms. Laughlin complained of an acute episode of shoulder pain that started when she lifted her child a few days earlier.  Dr. Wu found muscle tension and decreased range of motion in the shoulder with an equivocally positive impingement sign, but Ms. Laughlin retained full strength.  Dr. Wu administered an injection of a coricosteroid with good effect.  Tr. 852, 931.

On November 12, 2003, Ms. Laughlin complained of shoulder pain exacerbated by doing janitorial work and by her practice of lifting her 20-pound child with the left arm.  Her shoulder examination was unchanged.  Dr. Wu referred Ms. Laughlin for neuropathy and physiatry evaluations and recommended physical therapy and massage.  Tr. 953.  On January 29, 2004, Ms. Laughlin's shoulder examination was unchanged.  Dr. Wu referred her for an electromyography examination.  Tr. 951.  Dr. Wu did not see Ms. Laughlin again before completing the questionnaire and Ms. Laughlin did not follow up on his referrals and treatment recommendations.  Tr. 931.

These progress notes suggest some limitation in range of motion, but do not include findings regarding Ms. Laughlin's lifting capacity.  Dr. Wu's examinations did not reveal weakness or muscle

wasting consistent with a person who did not use her shoulder in everyday activities.  Ms. Laughlin's subjective report to described regular lifting in excess of that limitation.

The ALJ found some of Dr. Wu's findings equivocal or not consistently reproducible.  Ms. Laughlin had variably reproducible tenderness in the muscles of her shoulder and an equivocal impingement sign.  Dr. Wu expressed uncertainty whether Ms. Laughlin was subjectively limiting herself, finding it difficult "to determine how much of this is her baseline depression overlying otherwise moderate aches and pains."  Tr. 953.  Such uncertainty is also evident in Dr. Wu's statement on the questionnaire "My recommendation is to have someone with experience in occupational medicine evaluate Andria and have her undergo a functional capacity evaluation."  Tr. 937.

The ALJ found Ms. Laughlin's failure to follow up with treatment recommendations indicated her shoulder limitation was not as severe as she claimed.  It is rational to conclude that a patient with debilitating symptoms would follow recommended treatment.  This is particularly true here because Dr. Wu opined that her conditions would have a good prognosis for resolution if she complied with treatment.  Tr. 864, 931.

The ALJ found Dr. Wu's brief and irregular treatment history limited his ability to accurately assess Ms. Laughlin's shoulder limitation.  Dr. Wu described his contact with Ms. Laughlin as "intermittent punctuated by no-shows for appointments and rescheduling of appointments." Tr. 931.  As the progress notes show, Dr. Wu only examined Ms. Laughlin's shoulder on three occasions during a brief period before completing the questionnaire.  The ALJ could rationally conclude that this brief treatment relationship did not establish a chronic lifting limitation, especially in light of Ms. Laughlin's failure complete follow up evaluations Dr. Wu felt necessary.

The ALJ could reasonably conclude from the absence of objective medical findings, the meager clinical findings and the brief, irregular treatment history, that Dr. Wu premised the lifting limitation of less than 10 pounds on Ms. Laughlin's subjective description of her lifting capacity. An ALJ is entitled to reject a treating physician's opinion that is premised primarily on subjective complaints that the ALJ properly finds unreliable. *Fair v. Bowen*, 885 F.2d 597,605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

In conclusion, the ALJ's written decision demonstrates that he gave due consideration to Dr. Wu's questionnaire and accepted the parts of his opinion that were consistent with the medical evidence and the record as a whole.   The ALJ's reasons for rejecting Dr. Wu's lifting limitation of less than 10 pounds are clear and convincing and supported by a reasonable interpretation of substantial evidence.   Accordingly, Ms. Laughlin's challenge to the ALJ's evaluation of Dr. Wu's questionnaire is rejected.

### III.   The Lay Witness Testimony

Ms. Laughlin contends the ALJ failed to properly consider the testimony of Jim Pense, a lay witness.  The Commissioner concedes the ALJ failed to mention Mr. Pense's testimony, but argues the failure was harmless.

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Commissioner, Social Sec. Admin.,* 454 F.3d 1050, 1053 (9th Cir. 2006).  Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  If the ALJ wishes to discount the testimony of a lay witness, he must give reasons that are germane to the witness. *Dodrill v. Shalala,* 12 F.3d  at 919.

An ALJ need not discuss all evidence that is presented however.  He must explain why he rejected evidence only if it is "significant and probative."  *Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984).

Mr. Pense's testimony endorsed the same limitations identified in Ms. Laughlin's testimony. He observed that Ms. Laughlin walks slowly and stops to rest after 3 blocks, tends to drop things, appears to be in pain 30% of the time, stops to rest after 30 to 45 minutes of activity and seems to have a slow pace. Mr. Pense also endorsed Ms. Laughlin's testimony that she has frequent crying spells and panic attacks, is cranky and irritable and has a poor memory.  Tr. 1087-91.

The ALJ's failure to discuss Mr. Pense's testimony does not require reversal in this case.  Mr. Pense did not observe Ms. Laughlin in a work setting.  He did not specify how the symptoms he described would affect Ms. Laughlin's ability to perform specific work activities and his statements do not have the detail that would permit formulation of work-related limitations.  Accordingly, it is unclear that the ALJ rejected Mr. Pense's testimony in assessing Ms. Laughlin's RFC.

As with Ms. Laughlin's testimony, the ALJ included restrictions in his RFC assessment reflecting the symptoms Mr. Pense described, to the degree they were consistent with the record as a whole.  To the extent Mr. Pense described work-related limitations exceeding those in the RFC assessment, his testimony was subject to the same reasons the ALJ used to discount Ms. Laughlin's testimony.  In particular, like Ms. Laughlin's testimony, the lay testimony is inconsistent with the available medical evidence.  Under these circumstances, the ALJ's failure to discuss the Mr. Pense's testimony separately from Ms. Laughlin's testimony does not require reversal.  *Vincent v. Heckler,* 739 F.2d at 1395.

## V.    Remaining Contentions

Ms. Laughlin contends the ALJ erroneously failed to determine whether she is capable of working on a regular and continuing basis as required by SSR 96-8p, 1996 WL 374184, assess unspecified limitations from obesity as required by SSR 02-01p, 2000 WL 628049, and assess her difficulties coping with stress as required by SSR 85-15, 1985 WL 56857.

Ms. Laughlin bears the burden of establishing her impairments. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). The ALJ's written decisions demonstrates that he considered all the evidence in the case record and all the allegations of limitations and restrictions. He did not find support in the record for additional limitations from stress, obesity or a lack of capacity for sustained work. Accordingly, Ms. Laughlin failed to satisfy her burden of proof on these issues.

## VI.    Vocational Testimony

Ms. Laughlin contends the ALJ elicited testimony from the vocational expert with a hypothetical question that did not contain all of her limitations and restrictions.

The ALJ considered all the evidence and framed his vocational hypothetical question based on the limitations supported by the record as a whole; the hypothetical limitations reflected reasonable conclusions that could be drawn from the evidence in the record. An ALJ is not required to incorporate limitations based on evidence that he properly discounted. *Batson v. Comm'r*, 359 F.3d at 1197-98.

The court must uphold the Commissioner's determination if it supported by substantial evidence, even if the evidence can rationally be interpreted in a way that supports Ms. Laughlin's assertion of additional limitations. *Andrews v. Shalala,* 53 F.3d at 1039 ; *Morgan v. Commissioner*,

169 F.3d 595, 599 (9th Cir. 1999). Ms. Laughlin's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

Based on the foregoing, the ALJ's decision is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED.

DATED this __6th__ day of ___February___, 2008.

/s/ Michael W. Mosman
Michael W. Mosman
United States District Judge